UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
ELKINS

UNITED STATES OF AMERICA,

v.                                                    CASE NO. 2-20-CR-7
                                                      (JUDGE KLEEH)

COURTNEY MARIE ZIRKLE,

        Defendant.

## REPORT AND RECOMMENDATION RECOMMENDING DEFENDANT'S MOTION TO SUPPRESS BE DENIED

This matter comes before the undersigned pursuant to a referral by Honorable United States District Judge Thomas S. Kleeh referring Defendant Courtney Marie Zirkle's Motion to Suppress (ECF No. 22) filed in this matter on April 2, 2020, to the undersigned for a hearing and Report and Recommendation. The Government filed a Response in Opposition (ECF No. 23) on April 22, 2020, and Defendant filed a Reply to United States' Objection (ECF No. 24) on April 30, 2020. The undersigned held a Motion Hearing in this matter on Thursday, May 7, 2020 at which appeared the Government by Assistant United States Attorney Stephen Warner and the Defendant, Courtney Marie Zirkle, in person and by Counsel Hilary Godwin, Assistant Federal Public Defender.

The Court would note that due to the ongoing COVID-19 pandemic, all parties, including the Defendant, appeared by video conference. Accordingly, Defendant was informed of her right to appear in person at the same location as the undersigned, the attorneys, and any witnesses and Defendant agreed to appear by video pursuant to LRCrP 43.01 and Standing Order 3:20MC28. Defendant was afforded time prior to the hearing to speak via video with his attorney privately. Upon consultation with her attorney, the Defendant executed a written Waiver of Personal Appearance and Consent to Appear by Videoconference (ECF No. 30).

This Report and Recommendation examines the following issue: (1) whether the warrantless search conducted on January 18, 2019, pursuant to a condition of her parole (ECF No. 32-3), was

1

lawful and appropriate in scope. Answering this question in the affirmative for the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress (ECF No. 22) be **DENIED**.

## I.     BACKGROUND AND PROCEDURAL HISTORY

Defendant Courtney Marie Zirkle was serving parole after serving a sentence for a conviction in West Virginia State Court on a felony conspiracy charge. Defendant began serving parole in February 2018. In January 2019, officers with the Mountain Region Drug and Violent Crime Task Force ("MRDTF") listened to a recorded phone call between an inmate at Tygart Valley Regional Jail and an unidentified female (ECF No. 22 at 1; ECF No. 23 at 1). During this call, the unidentified female stated that she had picked up a "40" for him, which the officers suspected to be a .40-caliber firearm. Id. They asked Parole Officer Matthew Currence to try to identify the female in the call, which he identified as Defendant. Id.

On January 19, 2019, officers contacted Defendant about this firearm transaction, at which time Defendant assisted the officers in recovering the firearm (ECF No. 22 at 1-2; ECF No. 23 at 2). The officers then inquired as to the location of Defendant's cell phone, and left for Defendants' residence, Defendant's parents' house, in order to locate the phone (ECF No. 22 at 2; ECF No. 23 at 2). When the officers and Defendant arrived at the residence, the officers knocked on the door and Defendant's adult daughter, Aaliyah McBride, answered the door. Id. The officers asked if Ms. McBride would retrieve the cell phone for them. She agreed, stating that Defendant had given it to her to hide. Ms. McBride also stated that a bag she had not seen before could further be located with the cell phone, and asked the officers come inside and search the bag, as she was suspicious of the bag and its contents (ECF No. 22 at 2; ECF No. 23 at 2).

Once inside, Ms. McBride led the officer to her bedroom and showed him where the cell phone and bag were hidden – the top drawer of her dresser (ECF No. 23 at 2). At Ms. McBride's request and with her consent, the officer searched the bag and found what appeared to be heroin (ECF No. 22 at 2;

ECF No. 23 at 2). At this point, the officer called for officers who were more prepared to come and search the bag. Defendant's parents arrived at the home around the same time as the additional officers.

At this time, the parents and Ms. McBride gave the officers written consent to search the home (ECF No. 32-1 and 32-2), and the officers proceeded to do so. In the bag, officers found digital scales, a substance believed to have been methamphetamine, and a substance believed to have been heroin. Id. In Ms. McBride's bedroom, the officers found a glittery pouch (ECF No. 22 at 2; ECF No. 23 at 3). Ms. McBride denied ownership of this pouch and denied knowledge of its contents. Id. When the officers opened the pouch, they found $801.00 in United States Currency (ECF No. 22 at 2-3; ECF No. 23 at 3). Defendant was confronted about the results of the search and, while she denied asking her daughter to hide the cell phone and denied any knowledge of drugs in the house, she did admit ownership of the glittery pouch (ECF No. 23 at 3). Defendant's parole was subsequently revoked, and she remained incarcerated until the state discharged her felony sentence in January 2020 (ECF No. 22 at 3).

On February 19, 2020, Defendant was indicted by the Grand Jury in the Northern District of West Virginia on one count of Possession with Intent to Distribute Methamphetamine, one count of Possession with Intent to Distribute Heroin, and one count of Unlawful Possession of a Firearm (ECF No. 1).

## II.      SUMMARY OF TESTIMONY

### A.  West Virginia State Parole Supervisor Matthew Currence

The first witness called by the Government at the Motion Hearing held on May 7, 2020 was West Virginia State Parole Supervisor Matthew Currence. Officer Currence testified that he is the Supervisor for the Northern District of West Virginia (Audio Recording of Motion Hearing held on May 7, 2020, in Elkins Judge District Courtroom, FTR Gold, at 1:07:16 – 22)[1]. Officer Currence

---

[1] All time references contained herein refer to the audio recording of the motion hearing held in the Elkins District Judge Courtroom on Thursday, May 12, 2020, found in FTR Gold.

testified that Defendant was on parole for a felony conspiracy charge (1:07:43 – 1:08:03). Defendant was released on parole on February 21, 2018 and reported to the parole office on February 22, 2018 (1:08:07 – 19). Defendant signed Exhibit #3, which refers to the WV Department of Public Safety – Rules and Regulations (ECF No. 32-3), a six-page intake packet containing a list of rules to be followed by all parolees, signed by all parolees at the beginning of their parole terms (1:10:29 – 45). Rule q of Exhibit #3 states as follows:

> The parolee or probationer shall submit to a search without warrant of his or her person, place of residency or motor vehicle by his or her parole officer for supervision purposes at any time during the parole period.

(1:11:13 – 29). On January 18, 2019, Officer Currence and Parole Officer Brian Thompson were in Officer Currence's vehicle when they received a phone call from Deputy (Dave) VanMeter. Deputy VanMeter had been investigating a jail phone call recording and asked Officer Currence and Officer Thompson if they could identify a female voice on the recording (1:11:33 – 1:12:04). Officer Currence and Officer Thompson went to the Drug Task Force Office in Randolph County, West Virginia to meet Deputy VanMeter (1:12:04 – 16). Special Agent (Steve) Worthy was also at the office at this time.

Upon arrival at the Drug Task Force Office, Officer Currence listened to the recording of the phone call and was able to determine that the woman on the all was Defendant. He was able to determine it was her voice because, at the time, Defendant was Officer Currence's office janitor at the Elkins Parole Office. (1:12:16 – 1:13:05). The portion of the call to which Officer Currence listened caused alarm, because Defendant had been recorded speaking about acquiring a "40," which Officer Currence interpreted to be a .40-caliber firearm, and transporting it somewhere.

Defendant also mentioned on the recording a money transaction of some kind to be made to an application on her phone (1:13:07 – 46). Officer Currence believed the money transaction referred to in the recording could have been related to some sort of drug transaction (1:13:47 – 1:14:05). At this time, Defendant was cleaning at the Elkins Parole Office, so Officer Currence and Parole Officer

Thompson went to the Parole Office to speak with Defendant (1:14:07 – 45). Officer Currence spoke with Defendant about the phone call, and Defendant admitted that she did have a firearm for another parolee, but she had taken it to the house of someone named Mr. Summerfield (1:14:46 – 1:15:31). Defendant possessing a firearm is a violation of her parole (1:15:34 – 38). At this time, Officer Currence asked Defendant if he could see her cell phone, to which she responded that she did not have a cell phone (1:15:44 – 1:16:08).

Defendant agreed to speak with Deputy VanMeter, so Officer Currence, Defendant, Deputy VanMeter, Parole Officer Thompson, and two others proceeded to meet in the parking lot of the Randolph County Sheriff's Department. Defendant gave them directions to Mr. Summerfield's residence, and the group travelled to his residence to retrieve the gun (1:16:08 – 1:18:07).

Officer Currence, Parole Officer Thompson, and Defendant went to Defendant's parents' home, where Defendant also resides, to ask Defendant's parents if Defendant keeps a cell phone in this house (1:19:25 – 57). Defendant, her parents – Terrill and Denise Roth – and sometimes her brother reside in this house (1:20:11 – 27). After knocking on the door, Defendant's adult daughter, Aaliyah McBride, answered the door. Officer Currence asked Defendant's adult daughter if Defendant's parents were home, and Defendant's daughter answered that she was the only one home (1:20:43 – 59). On the porch of the house, Officer Currence explained that he was looking for a cell phone and asked if Defendant's daughter would retrieve it for him (1:21:00 – 44). She agreed, and also asked Officer Currence to search a bag hidden with the cell phone that the daughter had never seen before (1:21:44 – 59). Defendant's daughter invited Officer Currence into the house, then her bedroom, and led Officer Currence to the cell phone and bag. Officer Currence started to unzip the bag and saw a brown substance wrapped in cellophane, which he believed to be heroin (1:22:00 – 40). Officer Currence was not prepared to search a bag in which he suspected to be drugs, so he stopped (1:22:40 – 51). He went downstairs and called the Deputy VanMeter of the Drug Task Force to alert him of the drugs (1:22:52 – 1:23:10).

Defendant was in Officer Currence's vehicle once this search took place (1:23:13 – 23). Defendant was not under arrest at this time. After the search, Defendant was placed under arrest (1:23:24 – 47). Officer Currence testified that this visit served a parole purpose by tying together the phone call, the firearm, and the money transaction (1:23:58 – 1:24:24). Before the Task Force Officers arrived, Officer Currence asked Defendant's daughter to call Defendant's parents and ask them to come home (1:24:38 – 54). Defendant's parents arrived at the house around the time the Task Force Officers – Deputy VanMeter and TFO Steve Worthy – arrived. They worked together to fill out the necessary paperwork, and the Task Force Officers searched the home (1:24:42 – 1:25:15). Officer Currence testified that Defendant's parents own the house (1:25:15 – 22).

When questioned by Defendant's counsel, Hilary Godwin, Officer Currence testified that he began the meeting with Defendant in the early afternoon (1:26:00 – 12). At the parole office, Defendant admitted that she obtained the firearm and transferred it to Mr. Summerfield, which would have been a parole violation (1:26:21 – 41). Officer Currence had to investigate further to determine whether Defendant violated her parole (1:26:53 – 1:27:10). The group retrieved the firearm sometime in the afternoon (1:27:34 – 53). Officer Currence testified that Defendant had been detained during the afternoon, but not arrested (1:28:26 – 37).

Officer Currence testified that the group went to Defendant's home around 2:30 PM, so it was possible that Defendant had been detained with them for 3 hours (1:28:47 – 1:29:03). When asked about his arrival Defendant's home, Officer Currence recounted the events that had happened as described above. Defendant's daughter also notified Officer Currence that she was a college student at Davis & Elkins College in Elkins, WV, and only stayed at her parents' house part-time, although she did maintain a bedroom at the residence (1:29:56 – 1:30:20). Officer Currence testified that he overheard Defendant's parents tell the Task Force Officers that they did not need a search warrant and that if there are drugs in the house, they want them removed (1:31:50 – 1:32:04). Officer Currence

obtained consent from Defendant's parents and written consent from Defendant's daughter after the search (1:32:20 – 30).

**B. ATF Special Agent Steve Worthy**

The Government's second witness was Special Agent ("SA") Steve Worthy of the Bureau of Alcohol, Firearms, and Tobacco. SA Worthy was working in Randolph County on January 18, 2019 (1:34:59 – 1:35:05). SA Worth testified that he became involved in the investigation into Defendant on the morning of January 18, 2019 when Deputy VanMeter and Officer Currence had positively identified Defendant and suspected a firearm was involved (1:35:27 – 44). SA Worthy arrived at the Randolph County Sheriff's Department at around the time Defendant was being interviewed (1:35:44 – 1:36:13). SA Worthy learned that a firearm that Defendant acquired was being held at Mr. Summerfield's home, and then travelled to Mr. Summerfield's home (1:36:17 – 54). After introductions, Mr. Summerfield informed SA Worthy that Defendant did leave the firearm with him because her home could be searched at any time as a condition of her parole (1:36:54 – 1:37:53). SA Worthy took possession of the firearm, and he and Deputy VanMeter travelled back to Elkins (1:37:53 – 1:38:06).

Officer Currence called SA Worthy to inform him that he had found what appeared to be narcotics at Defendant's residence and requested that he and Deputy VanMeter join him at the residence to perform a search (1:38:06 – 49). SA Worthy and Deputy VanMeter drove to Defendant's residence about half an hour after receiving the phone call. Upon arrival, Officer Currence informed the two of what he had found (1:38:49 – 1:39:29). Before conducting the search, SA Worthy obtained consent to search the residence from Defendant's parents – the homeowners – and obtained consent to search Ms. McBride's bedroom from Ms. McBride herself (1:40:01 – 40).

SA Worthy testified that Exhibit #1 (ECF No. 32-1) is the Consent to Search form that he obtained from Defendant's parents and that Exhibit #2 (ECF No. 32-2) in the Consent to Search form that he obtained from Ms. McBride (1:40:47 – 1:41:26). SA Worthy obtained consent from each of

Defendant's parents while speaking to them in the living room of their residence (1:41:26 – 1:42:00). Defendant's parents informed SA Worthy that they each had access to all rooms within the residence (1:42:50 – 1:43:29). Based on his conversation with Defendant's parents, he believed he had the authority to search the whole house (1:43:39 – 45). Ms. McBride informed SA Worthy that there was not anything in her bedroom that SA Worthy could not search (1:44:44 – 54). When SA Worthy arrived upstairs, the other officers showed him that they had recovered suspected methamphetamine, suspected marijuana, suspected heroin, unknown white pills, and an iPhone 7 in the top drawer of Ms. McBride's dresser (1:45:55 – 1:47:32). A sum of U.S. currency was found in a glittery pouch and a powdery substance labeled as "Carolina Kratom," both found in Ms. Zirkle's bedroom (1:47:35 – 56)[2]. Defendant's bedroom was not locked (1:48:24 – 29).

Upon questioning by Counsel for Defendant, SA Worthy clarified that prior to his arrival, Officer Currence had found what he had suspected to be narcotics but was not sure because he did not fully search the bag in Ms. McBride's room (1:49:23 – 46). SA Worthy testified that he did not think to seek Defendant's consent to search because she was not present inside the home when he was obtaining consent from her parents and Ms. McBride. However, Defendant was on the premises, in Officer Currence's vehicle (1:51:00 – 31). The doors two both Ms. McBride's and Defendant's bedrooms were open when SA Worthy arrived (1:52:18 – 24).

Counsel for the Government asked SA Worthy if any digital scales were found during the search, to which SA Worthy answered in the affirmative, though he could not remember where they were found (1:53:42 – 1:54:04). SA Worthy also testified that the iPhone 7, which was believed to

---

[2] The Court notes the inconsistencies between the Motion to Suppress (ECF No. 22), the Government's Response (ECF No. 23), and the testimony given during the hearing with respect to the location of the glittery pouch. However, the Court finds that the location of the glittery pouch is not determinative of the issue at hand, as the officers performed the search of Defendant's bedroom pursuant to the conditions of her parole, and the officers obtained consent to search Ms. McBride's bedroom.

belong to Defendant, was not inside the pink bag in Ms. McBride's bedroom, but placed on top of the bag (1:54:43 – 1:55:06).

SA Worthy was recalled for more testimony after the testimony of Ms. McBride. SA Worthy testified that after the search, he interviewed Defendant. Defendant denied owning the drugs in the pink bag, but when SA Worthy asked if the drugs belonged to Ms. McBride, Defendant said they did not because Ms. McBride does not consume drugs. Defendant stated that she would "take the fall" for the drugs (2:24:53 – 2:25:23).

SA Worthy testified that this interview took place at the probation office after the search of Defendant's residence had been completed (2:25:57 – 2:26:15).

### C. Randolph County Sheriff's Department Deputy David VanMeter

The Government's next witness was Deputy David VanMeter, a Senior Deputy with the Randolph County Sheriff's Department and member of the Mountain Region Drug and Violent Crime Task Force (1:58:35 – 48). On January 18, 2019, Deputy VanMeter was listening to phone call recordings while investigating an inmate that turned out to be Defendant's boyfriend at the time (1:58:55 – 1:59:17).

Deputy VanMeter contacted the parole office and asked Officer Currence to come to his location and try to identify the voice of an unidentified female on the recordings (1:59:39 – 47). Officer Currence was able to identify the voice as that of Defendant (1:59:48 – 58). Deputy VanMeter testified that Defendant had mentioned some money transaction that took place via an application on her cell phone and had also mentioned a "40," which Deputy VanMeter interpreted to be a .40-caliber firearm (2:00:00 – 26). Deputy VanMeter testified that after identifying Defendant's voice on the recordings, Officer Currence returned to the parole office to speak with Defendant (2:00:30 – 54).

Deputy VanMeter then travelled to the Randolph County Sheriff's Department, where he met up with Officer Currence and interviewed Defendant in his unmarked vehicle (2:00:54 – 2:01:15).

Defendant stated that she did purchase a firearm for around $150 (2:01:17 – 41). Defendant also advised Deputy VanMeter that she traded a gram of either methamphetamine or heroin for the firearm, then took the firearm to Mr. Summerfield's residence because she knew that she was not supposed to have a firearm in her possession (2:01:41 – 2:02:03). At this point, Deputy VanMeter contacted SA Steve Worthy of the ATF prior to travelling to Mr. Summerfield's residence (2:02:07 – 26). At Mr. Summerfield's residence, the officers advise Mr. Summerfield that they were at his residence in search of a firearm that may have been used in a crime, to which he responded that he was in possession of the firearm (2:02:55 – 2:03:10).

Later that day, Deputy VanMeter and SA Worthy travelled to Defendant's residence after receiving a phone call from Officer Currence advising that he found a pink, zippered container that contained what appeared to be drugs (2:03:35 – 2:04:04). Upon arrival, Deputy VanMeter spoke with Defendant's parents and daughter, Ms. McBride (2:04:04 – 25). Each of Defendant's parents and Ms. McBride provided consent to search the residence. During SA Worthy's conversation with the parents, Deputy VanMeter heard the parents say that they had access to the entire residence and that the officers could search everywhere in the residence (2:04:27 – 2:05:47).

Deputy VanMeter conducted a search of the residence after consent had been obtained (2:06:28 – 37). Deputy VanMeter first search Ms. McBride's bedroom, in which he observed a cell phone and a pink, zippered bag in Ms. McBride's dresser (2:06:39 – 2:07:07). Deputy VanMeter observed drug paraphernalia with digital scales, a Ziploc bag containing miscellaneous capsules, a Ziploc bag containing a crystal-like substance and miscellaneous pills, marijuana, suspected heroin, and package containing "Kratom," a synthetic drug (2:08:11 – 2:09:20). The officers also found an iPhone 7 Plus on top of the pink bag in the dresser drawer in Ms. McBride's bedroom, as well as a sparkling purse containing a bulk of U.S. currency in Defendant's bedroom (2:10:48 – 2:11:20). The bulk of U.S. currency totaled approximately $801 (2:12:13 – 18).

When examined by Counsel for Defendant, Deputy VanMeter testified that he could not have seen the contents of the pink bag if it were closed, and that he had been advised that the bag did not belong to Ms. McBride (2:13:44 – 2:14:10).

Counsel for the Government asked Deputy VanMeter how long he had served on the drug task force, to which he answered that he had served on the task force for about four years (2:14:35 – 43). Deputy VanMeter testified that, based on his experience, the baggy he observed in the pink bag was of the kind typically used by drug dealers and drug users (2:15:05 – 10).

Finally, Deputy VanMeter testified that he did not observe any independent method of locking the bedroom doors within the house (2:15:20 – 48).

### D.  Defendant's daughter Aaliyah McBride

The first and only witness called by Defendant was Aaliyah McBride, Defendant's daughter. In January 2019, Ms. McBride was residing with her boyfriend at Davis & Elkins College but maintained a bedroom at her grandparents' home where she would reside intermittently. She stated that she used the bedroom mostly for storage (2:19:15 – 48). Ms. McBride testified that she did not keep her bedroom door locked and that there was not a deadbolt or key access to the room (2:20:36 – 46). Ms. McBride testified that, when asked by Officer Currence, she told him that Defendant did keep a cell phone at the residence, and that Defendant asked Ms. McBride to hold it for her while she was cleaning the parole office (2:21:10 – 28). Ms. McBride told Officer Currence the location of the cell phone, and mentioned that she noticed a bag that she had never seen in her bedroom before. She made it clear that it was not her bag and asked Officer Currence if he would search the bag (2:21:31 – 2:22:26).

Upon questioning from the Government, Ms. McBride testified that Defendant had a separate bedroom in the residence and did not keep it unlocked (2:22:37 – 46).

11

### III.  CONTENTIONS OF THE PARTIES

**A. Defendant's Motion to Suppress (ECF No. 22)**

Defendant's Motion to Suppress (ECF No. 22) seeks suppression of the evidence seized during the warrantless search of Ms. Zirkle's residence conducted on January 18, 2020. Specifically, Defendant wishes to suppress the two bags and their contents found in her daughter's room at the residence (ECF No. 22 at 4). Defendant argues that "at the time of the search the officers were aware that Ms. McBride did not have the authority to consent to the search of the bags' contents." Id. Defendant asserts that "[s]imply because a third party has authority to consent to a search of a general area, that authority does not automatically encompass every enclosed space within that area." (ECF No. 22 at 3). Defendant argues that Ms. McBride did not have the authority to consent to a search of the bags of another person and that since she notified the officers that the bags were not hers, the officers knew or should have known that she did not have the authority to consent to a search of the contents of the bags.

**B. Government's Response in Opposition (ECF No. 23)**

The Government challenges the Defendant's Motion with three objections: (1) Defendant does not have standing to challenge the search of the pink zippered bag; (2) Defendant assumed the risk that her unlocked bag and pouch would be searched when she left them in her daughter's bedroom, and; (3) Defendant's parole conditions permitted the search of the bag and pouch. (ECF No. 23 at 1).

The first objection the Government makes is that Defendant does not have standing to challenge the search. The Government argues that "the Fourth Amendment protects people not places, and those who deny ownership of property have no standing to challenge its seizure." (ECF No. 23 at 3).

The second objection the Government makes is that the search is valid because it was performed pursuant to Ms. McBride's consent. The Government cites United States v. Block, 590 2d. 535 (4th Cir. 1978), asserting that while "mankind's valises, suitcases, footlockers, strong boxes, etc.

12

are frequently the objects of [her] highest privacy expectations," Defendant's pink zippered bag was not a strong box within the meaning of Block. (ECF No. 23 at 4, citing *Block*, at 541). The Government asserts that by placing the unlocked bag in her daughter's bedroom, among her personal effects, without mention, she assumed the risk that someone would discover the bag and search through its contents (ECF No. 23 at 4-5). The Government also applied this argument to the glittery pouch (ECF No. 23 at 5).

The third and final objection made by the Government was that the search was valid because it was performed pursuant to a condition of Defendant's parole. The Government asserts that Rule q of Defendant's conditions of parole, by which she initialed, provides, "A parolee or probationer shall submit to a search without warrant of his or her person, place of residence or motor vehicle by his or her parole officer for supervision purposes at any time during the parole period." (ECF No. 23 at 5). The Government states that a warrantless search is not invalidated merely because it serves dual purpose – supervision purposes and criminal prosecution, citing United States v. Gordon, 540 F.2d 452, 453 (9th Cir. 1976). The Government argues that the criminal prosecution purpose of the seized evidence should not negate the supervisory purpose – to aid the parole board in assessing the weight of evidence and whether to continue Defendant's supervision based on all the evidence (ECF No. 23 at 5-6).

### C. Defendant's Reply to the Government's Objections (ECF No. 24)

Defendant addressed each of the Government's objections in her reply. Defendant asserts that she does have standing because she only denied ownership of the bag after the search had been conducted (ECF No. 24 at 4). Defendant relies on United States v. Flowers, 912 F.2d 707 (4th Cir. 1990), in which the defendant lacked standing because he denied ownership of the bag prior to the search (ECF No. 24 at 3). Defendant argues that she retains standing because she did not deny ownership until after the search (ECF No. 24 at 4).

Defendant then addresses the second objection by the Government. Defendant argues that she did have an expectation of privacy since the bags were closed, opaque, and hidden in a drawer, out of sight (ECF No. 24 at 4). Defendant also argues that the bags being located in her daughter's room does not diminish her expectation of privacy with respect to the contents of the bags. Defendant uses the case law referred to by the Government to establish that one can maintain an expectation of privacy with respect to their personal effects placed in the room of another (ECF No. 24 at 5-6). Defendant argues that because Ms. McBride denied ownership prior to the search of the bags, the officers should have known that she did not have the authority to consent to a search of those bags (ECF No. 24 at 6).

## IV.    LEGAL ANALYSIS

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. However, when an individual is on probation or supervised release, he or she may be subject to "search conditions" which "significantly diminish" an individual's "reasonable expectation of privacy." United States v. Hill, 776 F.3d 243, at 248-49 (4th Cir. 2015) (quoting United States v. Knights, 534 U.S. 112, at 119-20 (2001).

In United States v. Knights, 534 U.S. 112, 114 (2001), "the Court held that a probation officer with reasonable suspicion could search a probationer's residence without a warrant when the probationer had agreed to a warrantless search condition." Hill, 776 F.3d at 248 (citing Knights, 534 U.S. at 118). The Court in Knights "found the search reasonable under the totality of the circumstances, 'with the probation search condition being a salient circumstance.'" Id. In order to determine the reasonableness of the search, "the Court balanced the privacy intrusion against the government's need to conduct the search to promote its legitimate interests." Id. at 248 – 49. The Court found as relevant "to both was Knights's 'status as a probationer subject to a search condition.'" Id. at 249 (citing Knights, 534 U.S. at 119). In terms of the Government's need, "the Court identified the government's interest in monitoring probationers closely because of their greater likelihood of committing a crime

than the general population." Id. at 249 (citing Knights, 534 U.S. at 121). Ultimately, the Court "held that 'the balance of these considerations requires no more than reasonable suspicion to conduct a search of this probationer's house.'" Id.

The United States Court of Appeals for the Fourth Circuit found that "the specific probation condition authorizing warrantless searches was critical" to the United States Supreme Court's holding in Knights. Hill, 776 F.3d at 249. The Court in Knights held "the warrantless search of Knights, supported by reasonable suspicion and authorized by a condition of probation, was reasonable within the meaning of the Fourth Amendment." Hill, 776 F.3d at 249 (quoting Knights, 534 U.S. at 122). The Court further "underscored that the 'probation order clearly expressed the search condition and Knights was unambiguously informed of it.'" Id. (citing Knights, 534 U.S. at 119).

In Hill, the Fourth Circuit ordered that evidence be suppressed in large part because no such warrantless search condition existed. Hill, 776 F.3d at 249-50. Accordingly, the undersigned finds that the primary consideration for the Court in cases such as Hill, Knights, and the case at hand is the existence and language of a search condition as part of a probationer's supervision.

Regarding the Government's standing argument, the undersigned is of the opinion that Defendant does have standing to challenge the search under these particular circumstances. The search in this case occurred pursuant to a condition of her parole in a residence in which Defendant was residing for purposes of her parole, giving her standing to challenge it as unlawful. The undersigned is further of the opinion that Defendant's arrest did not, in any way, cause the end of her parole supervision. Counsel for Defendant raised this issue in support of her Motion to Suppress, however Counsel has not provided any case law to bolster this proposition. The Court allowed one week following the Hearing for Counsel for Defendant to supplement her Motion to Suppress (ECF No. 22) with any applicable authority in support of her position. Counsel for Defendant did not submit any supplemental material to the Court. The undersigned is of the opinion that a parolee's term of supervision ends only by order of the Court or discharge of the term of parole. Accordingly, the Court

finds that Defendant's parole term was not ended by the arrest, thus not invalidating the search on that ground.

Here, Defendant, Ms. Courtney Marie Zirkle, was subject to a specific parole condition authorizing warrantless searches. Rule q of the Rules and Regulations Governing Parole Supervision states as follows:

> A parolee or probationer shall submit to a search without warrant of his or her person, place of residency or motor vehicle by his or her parole officer for supervision purposes at any time during the parole period.

(ECF No. 32-3). This rule provides that the parole officer can perform a warrantless search "for supervisory purposes" at any time. However, here it seems that this search and its fruits served both a supervisory purpose, in determining the status of the remainder of Defendant's parole, and a prosecutorial purpose, as evidence in the present case against Defendant. The holding in United States v. Gordon, 540 F.2d 452, 453 (9th Cir. 1976) provides guidance on this issue. In Gordon, the defendant's probation officer was contacted by a narcotics task force officer who informed the probation officer that defendant Gordon may be dealing in controlled substances. Based on this information, both probation officers and task force officers travelled to defendant's residence and upon arrival, the task force officers performed a warrantless search. This search resulted in the task force officers finding firearms. As a result, Gordon's probation was revoked, and he was criminally prosecuted for possessing firearms. The court held that a warrantless search is not invalidated simply because it mutually satisfies a supervisory purpose and a prosecutorial purpose.

In the present case, Defendant, like Gordon, was subjected to a warrantless search that resulted in the revocation of her parole and an indictment in a separate case. However, a difference from Gordon that supports upholding the search, both probation officers and task force officers performed the search. In fact, the search was initiated by a probation officer, and the task force officers were only called in when the probation officer realized he was not equipped to search a bag that appears to contain drugs. This makes even more clear the supervisory purpose of the search. The evidence of a money transaction

to an application on Defendant's cell phone, about which she lied to her probation officer, created the suspicion that she may be dealing in narcotics. This suspicion gives rise to a supervisory purpose for the search – to determine whether Defendant violated the conditions of her parole.

Another difference between the case at hand and Gordon is that Gordon was not under arrest while the search was being conducted, while here Defendant was placed under arrest prior to the search. However, since the Court has established that the arrest did not end Defendant's term of parole, she was still subject to the conditions of her parole, including Rule q.

Given that Defendant was subject to a valid warrantless search condition as part of the conditions of her parole and that this search was conducted pursuant to said condition, the undersigned **RECOMMENDS** the District Judge find the warrantless search of Defendant's residence valid under Rule q of the Rules and Regulations Governing Parole Supervision.

## V.     CONCLUSION

Accordingly, for the reasons stated herein, the undersigned **RECOMMENDS** Defendant's Motion to Suppress (ECF No. 22) be **DENIED**.

Any party shall, within fourteen (14) days after being served with a copy of this Report and Recommendation, **on or before Friday, May 29, 2020**, file with the Clerk of the Court **specific written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.** A copy of such objections should also be submitted to the Honorable Thomas S. Kleeh, United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** Snyder v. Ridenour, 889 F.2d 1363 (4th Cir. 1989); Thomas

v. Arn, 474 U.S. 140 (1985); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

The Court **DIRECTS** the Clerk of the Court to provide a copy of this Report and Recommendation to the Defendant at his last known address on the docket, any parties who appear *pro se* and all counsel of record, as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted on Friday, May 15, 2020.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE